LLC v. Axis Insurance Company. Mr. Brooks. Good morning, Your Honor. It's an honor to be here. I handed out some notebooks in advance, just taken primarily from our pleadings just to simplify things. But it's an honor to be here, and I wanted to – just an honor every time I come. This case is – a little background facts are important here because – to understand the policy in question. But this – we've all heard the phrase, tempest in a teapot, mountain out of molio. The old underlying controversy in this whole case is the tempest in a teapot. Our client, Paloma Resources, is an oil and gas company, very successful. They serially drill South Texas, North Texas, Louisiana, North Dakota. They decided to go to Oklahoma to drill. They'd never been there before. They have a new hire named Mauricio Toro who goes to Oklahoma to figure out drilling issues. Now everybody knows that no oil well is drilled in America, an oil or gas well, without fracking. And fracking involves going down thousands of feet and then sometimes one or two miles horizontally. And fracking is common, but the geographical issues, the geological issues you encounter are very complex. And so people need to know about that. And the industry talks about these issues. These are – like lawyers have seminars that talk about trade secrets and litigation. The people in the industry do too. It's commonly shared. Fracking is done primarily by third-party contracting, like Haliburton. So Mauricio Toro was talking to people to try to gain information about what are the challenges you face when you do frack in Oklahoma, which they'd never been before. Two of the people he talked to worked for Continental Resources, the largest employer in Oklahoma. Continental – and they – and these two people ultimately gave what amounts to 195 random documents about 25 wells. Axis has never seen the documents. No court has ever seen the documents. I've seen them, but no court has without being produced into the evidence in the record. Continental finds out and they get mad. They call Paloma and a settlement is worked out. That falls through the crack. Litigation ensues between – Continental sues the two employees. They sue Paloma and they sue our employee, Mauricio Toro, in rural Oklahoma. Now, the largest employer suing you in rural Oklahoma is not the most – it's a scary proposition. So Paloma wanted out of the case. They had gotten a demand letter from Continental in May of 2017. The lawsuit is filed on June 27th of 2017. So now, most of the Eight Corners Doctrine, everybody's familiar with it, but that's not the case here because the definition of a demand or a claim in this case under this policy, which I've attached, the primary issues in the policy is tab 2, that's the general terms and conditions. The director and officer's coverage part, the primary one, is tab 3. And you can see that the definition of a claim under this tab 3, director and officer coverage part, includes any written demand, not just a lawsuit. So you could call it the Twelve Corners Doctrine. A letter comes in May making a demand, the lawsuit is filed in June, Continental has sued Paloma and Paloma wants to get it resolved. It's a tempest in a teapot. Paloma has to hire lawyers, trade secret lawyers, oil and gas lawyers, litigation lawyers, and lawyers that are familiar with Oklahoma for something that's nothing. They want out. And so, and their issues between Paloma and their employee Toro are aligned, primarily. But Toro was a rogue employee. He was not acting, he was a brand new hire. He was not acting to pursue a union instruction. He's not an officer, he's not a director, he has, there's no evidence in the record he had any power to do anything. He is no way a vice principal of this company. So he has to have separate counsel because he may have issues of his own to deal with and Paloma covers that. Now, we get into the controversy and we're trying to resolve it quickly. So a deal is essentially structured out and AXIS Insurance, our insurance company, is notified. Now if you will look at, I'm just going to reference these quickly, tab three is the policy itself and you can see on page 11 is a provision that allows Paloma, as the insurer, to actually try to settle the case, which they did. They notify AXIS, we think we've worked out a deal, we have a right to engage in settlement discussions, we think we've worked out a deal, page 11, it's under the top section six, subparagraph C, and we notify AXIS and AXIS says, and you can see on tab, the response for AXIS is tab 11, AXIS says okay, you can settle it. Now, for some reason, AXIS thinks that $350,000 has been offered by Paloma and that somehow sets a floor that we shouldn't have set and they say, we're not going to give you anything more than, the first $350,000 is yours, we'll give you everything over that $350,000 up to the $400,000 provided Mauricio Toro is released. So they approve of it. I mean, Paloma says, whatever, we're going to sign this document, but this was essentially what we acted on in reliance on this, and we got the case settled and we signed a settlement agreement with Continental, which is tab one. Now in tab one, the settlement agreement, we did not admit liability. In fact, it's very clear we haven't, if you can see tab one, the paragraph eight, I believe it is on page five, is no admission of liability. Paloma did not admit he did anything wrong. We did not acknowledge that these were trade secrets. We did not acknowledge they were confidential information documents. Now the term confidential information is used because that's a defined term, and that doesn't give it any more legal significance, it's just a defined term for purposes of the contract. But at any rate, the settlement agreement is reached, and so under the settlement agreement, if you look at paragraph 16, Paloma has the right to share information with its insurer. So we contact Axis and say, hey, the 195 documents are now being held, being held not by Continental, an independent consultant has come in and extracted any kind of data from Paloma Systems, put it onto a thumb drive, and given it to Ernst & Young, Paloma's agent, in Houston, Texas, where it remains today. And we say to Axis, come look at the documents, and they say, well, okay, we called Continental to avoid controversy because we don't want World War III, Continental says you can't do it. You can't show the documents to Axis. So we file a lawsuit against Continental to say, wait a minute, under paragraph 16, we have a right to, and when Axis found out that they weren't going to get to look at the documents, they said, we're not going to give you anything more. So we sued Axis for coverage to resolve. We work out a settlement with Continental to allow the documents to be showed, and a summary judgment in the meantime has been granted for Axis, which is what brings us here today. Now, the summary judgment that was granted against my client was primarily done so based on an exclusion in the policy, not a denial of coverage, but an exclusion, and as the court decided in 2022, it repeats, repeatedly says, exclusions are strictly interpreted against the insurance company. All insurance contracts are enforced, interpreted against the insurance. Exclusions under the Bitco case say it's particularly important that you do it where exclusions are concerned, because the insurance companies write these policies, as we all know. Now, if you look at the policy itself, tab 3, page 10, I believe, is the intellectual, so-called the intellectual property exclusion, and it's very small print, and it's hard to read. So what we did for clarity, hopefully, if you look at tab 4, we just excised it, and we weren't even happy with that, to be able to crystallize the argument. So if you look at tab 5, this is the intellectual property exclusion on which Axis convinced the busy United States federal judges in Houston to grant a summary judgment and essentially toss the case. Now, if you look at this, this paragraph is divided. We've divided it. This is not how it is. It's not divided like this in the policy itself. We've divided it this way for several reasons. First of all, because under the teachings of Thomas versus Reeves, the 2020 in-bank court decision of this court, determiners like any and the are appropriately outlined just like this. That's how you divide it grammatically, and that's what the teaching of Thomas versus Reeves is. That's what determiners like any and the are there for. Secondly, it's consistent grammatically with how the other provisions in the policy read. If you look at tab 8, for example, or yeah, tab 8, 6, I'm sorry, these are some of the other exclusions where they similarly employ, after the word involving, you see these, you see the articles, the determiners, any, the, and they're divided this way grammatically. Why Axis chose to not include dividers or paragraph divisions on number 7, I don't know. Nobody knows. But to break it up as we've done on 5, aids analytical, our analysis, and secondly, it's appropriate under the teachings of this court. Now, when you look at it this way, it becomes completely obvious that it covers three things, infringement of copyrights, trademarks, and patents, federally registered tax items, misappropriation of trade secrets, and unauthorized disclosures of confidential information, each one of which has a determiner in front of it. Now the operative phrase on which the court was induced to err is actually alleged. That's the operative phrase. And the phrase here, and the key question in this case, on which the honorable district judgment was led into error was he applied the phrase actual and alleged to all three of these sections, all three. And we say that that can't be done because if you apply actual or alleged in one, if that's the way it applies, then you cannot imply it to two and three. And I'll call them one, two, and three just for clarity and simplicity. Now, it becomes instantly apparent that when you say when the policy reads any actual or alleged copyright infringement, or the misappropriation of trade secrets, or the unauthorized disclosure, that the absence of actual and alleged in two and three means it does not get implied, hence it must be actually proved. Now to us, that's apparent. The exclusion itself speaks for itself when you draft it this way. You can't grammatically imply it. In fact, if you omit the word the, where you would say any actual or alleged the misappropriation of trade secrets, it doesn't work grammatically. You cannot make actual or alleged apply to two and three grammatically. Under this court's teachings, as recently as Thomas v. Reeves in Bank, the determiners are a critical issue. This is a matter of great importance because the teachings of this court and the Texas Supreme Court have been words matter. That's the teaching. Words matter. You can't strike inconvenient words out. You can't add words in. You can't make words superfluous by implying things in one place that would necessarily make something superfluous if you implied it in another place. So structurally, under the canons of all contract construction, it can't be done. Now, the definite articles in and of themselves under the teachings of Thomas v. Reeves, and the Thomas v. Reeves case, the end bank, cites Justice Scalia's scholarly work, I mean, most court cases in the Fifth Circuit cites Justice Scalia on these issues, these very issues. The use of an article or a like, any, and the in and of itself separates conceptually the three categories that are included. And the Thomas v. Reeves case, I won't go into it for time. I'm certain you guys are all familiar with it. But it was a end bank decision where there was a division among the court about what to do with the word the, but everyone agreed that the application of the rules of contract construction applied, and that was a consensus all across the board. The use of definitive articles is critical. Properly interpreted, actual, and alleged does not apply to two and three. Now, the court, if you look at tab nine, this is what the district court held. He said, the exclusion provides impertinent part that access will not be liable to pay on account of any claim based on arising out of, directly or indirectly resulting from, in consequence of, or in any way involving any actual or alleged conduct. He was induced to collapse actual or alleged into two and three as if it was a serial modifier that came before the word any and applied to all three. And he was induced into that error by access. And if you look at tab, tab six, I'm sorry, I have six. If you look at tab, at tab seven, eight, I'm sorry, eight. These are the places that access in the district court quoted the intellectual property exclusion. And they quoted it by omitting the word, the article V. So that it was misleadingly drafted to read, based, which the judge quoted, from, in consequence of, or in any way involving any actual or alleged misappropriation of trade secrets. So it, they omitted the, the word V that would obviously reveal it didn't make any sense and this busy federal judge does, goes with this. And they didn't do it once, they did it several times. And they haven't just done it in the district court, they did it here in the response brief. If you look at, at tab ten, that's exactly what they do here in this court. And it's very disappointing that, that this would be perpetuated. Now the district judge has an alternative ground for dismissal and if you look at, back at tab six, it, the alternative argument was, look under ten illegal profits. The court said, look, if, if what was intended was to exclude or, or to require actual infringement, then the, the drafters of the policy would have done what was done on number ten and so state. Because you can see the final preamble after A and B, it says, if established by a final non-appealable adjudication. And the secondary argument that the court made was, you know, that, that's if the court, if the contract had intended to cover only actual infringement and, and misappropriate, then it would have said that. But that's not right. It, that again, that violates the rules of canon, canons of contract construction for insurance companies. And it also violates the teachings of Nassar which basically say that the U.S. Texas Supreme Court said that you don't look at other provisions, exclusions to interpret the exclusions that are in the policy itself, the section in question. It's not the correct way to do it. Now, I'll save some of my comments for the rebuttal part. Go ahead. Good morning. May it please the court. My name is Tim Delabarre, and I represent the Appalachian Access Insurance Company. As my friend on the other side said, this is an insurance coverage case stemming from allegations of misappropriation of trade secrets in the oil and gas drilling world in Oklahoma. The district court correctly granted summary judgment in favor of access for two reasons. First, the intellectual property exclusion, when it's read in the context of the policy as a whole, clearly and unambiguously excludes coverage for the allegations made in that Oklahoma lawsuit. And second, the policy provides coverage in this case for Paloma's employee, Mauricio Toro. However, only those amounts that he is legally obligated to pay, and not any amounts that may benefit him. Before I turn to that first reason, I just want to correct something that my friend on three of the binder. Tab three contains the Director's and Officers' coverage part, which is a part of the policy. However, tab two contains the general terms and conditions, which are also part of the policy. On page eleven of that tab three, what he said gives Paloma the right to defend and settle the cases. If you look at the language of that paragraph, in particular, the preceding paragraph, it's clear that that applies only to wage and hour claims. The provision for defense and settlement that controls here is contained within the general terms and conditions on page seven of tab two of that binder, or if it's easier, it's on page 2329 of the Record on Appeal. With that correction, I'd like to turn to the first issue in this case, and that is the intellectual property exclusion, which controls this case. The district court's determination was correct for two reasons. First, as the district court concluded, the key phrase here is the arising out of, the exclusion is intended to be read broadly. The second is that when the insurance policy is read as a whole and from a utilitarian perspective, as the Texas Supreme Court says we must, it becomes clear that where the policy requires an actual determination, it says so. In its brief, Paloma posits that the district court's focus on the phrase arising out of ignores the question arising out of what. However, the arising out of what is clear. It's misappropriation of trade secrets, the possession of use of confidential information. The answer to that question is clear from the allegations in the Oklahoma lawsuit. Continental, the company that sued Paloma in the underlying case, asserted eight causes of action, each of which has to do with the misappropriation or theft of trade secrets or the actions of Paloma in covering up that misappropriation and theft. Simply stated, every allegation contained within that pleading has to do with misappropriation of trade secrets or Paloma's possession and use of Continental's confidential information. As this court noted in the National Fire Insurance Company versus Radiology case, when an exclusion contains the phrase arising out of, it's intended to be given a broad reading. And citing the Utica case from the Texas Supreme Court, this court said that when the incidental relationship to the described conduct for the exclusion apply. And that is precisely the facts of this case. All of the allegations in the Oklahoma lawsuit arise out of Paloma's industrial espionage. In the National Fire Insurance Company versus Radiology Associates case, this court said but for Riley's improper conduct, PCOR would have no claims against radiology and therefore the exclusion applied. Here, but for Toro's improper conduct, Continental would have no claims against Paloma and thus exclusion should apply as well. However, the rationale from that case applies even more strongly here. Because unlike in the Radiology Associates case, Toro was not acting on his own or solely for his own benefit. He was acting for the benefit of Paloma. The documents he obtained, Continental's confidential information and trade secrets, were uploaded to Paloma's X drive and shared. It's unclear how many people in the company had access to them. What is clear, however, is that after Continental sent its first demand letter, Paloma began an investigation and it was even Paloma's general counsel that prepared the report that was part of the first settlement agreement in which Continental alleged that contained misrepresentations and attempts to downplay the degree of industrial espionage, which led to the filing of the First Amendment petition in the Oklahoma lawsuit. One of the causes of action being misrepresentations from Paloma's general counsel in procuring that first settlement agreement. This isn't just one employee acting for his own benefit. This was an employee acting for the benefit of the company and then the company working to cover up those actions. Thus, the logic of the National Fire Insurance Company versus Radiology Associates case is almost directly on point to this, Your Honors. Furthermore, in the second settlement agreement, all of the claims being released are those that relate to the allegations in the litigation, the Oklahoma lawsuit, which, again, all relate to the misappropriation of trade secrets or covering that up, or Paloma's possession and use of Continental's confidential information. The releases portion of that settlement agreement is explicitly clear that those are the only claims being released. Thus, not only do all the allegations fall within the scope of the intellectual property exclusion, but the settlement was only for claims that would have fallen within the exclusion. There's no duty to indemnify or duty to defend. This logic is bolstered by the fact that when the policy is read as a whole, it becomes even more clear that the intellectual property exclusion applies in this case. As the Texas Supreme Court and this Court have repeatedly noted, insurance contracts, like all contracts, are to be read as a whole and that they are read from a utilitarian perspective, bearing in mind the particular commercial activity to be served. In this case, an insurance contract subject to the contours of the Eight Corners Rule, a well-defined, well-established provision of Texas law. In fact, the Texas Supreme Court is especially loath to find exceptions to the Eight Corners Rule. In the Richard v. State Farm case decided just a couple years ago, Texas Supreme Court made it clear that when parties attempt to contract around the Eight Corners Rule, they need to do so expressly and clearly. For example, as the District Court noted, in the illegal profit or conduct exclusion, the parties stated that the exclusion applies only if established by a final and non-appealable adjudication adverse to such insured in the underlying action. That's the type of clear statement that denotes the party's intent to contract around the Eight Corners Rule. Comparatively, in this case, in the intellectual property exclusion, there is no such clear intent. There's the actual or alleged language that forms the heart of Coloma's argument, but that hardly satisfies the requirements, particularly when, as many courts have noted, when the parties wanted to say something clearly, they knew how to do so and, in fact, did so. To read such a requirement into the intellectual property exclusion here would then serve to, um, beg the question, why did they say it so clearly in one provision and just imply it in another? This Court has similarly recognized the Texas Supreme Court's adherence to the Eight Corners Rule. In the Guide 1 v. Missionary Church case, when the parties relied on out-of-state authority finding the parties that contracted around the Eight Corners Rule, this Court said that if the parties want it to be the first appellate court in Texas or interpreting in Texas law to find that the parties have contracted around the Eight Corners Rule, they should have said so clearly and, in fact, footnoted saying that the unwavering commitment of Texas courts to the Eight Corners Rule renders these out-of-jurisdiction cases unpersuasive. The Eight Corners Rule is such a facet of Texas law that when keeping in mind the particular commercial activity to be served, as the Texas Supreme Court has repeatedly said, it becomes clear that the Eight Corners Rule is intended to apply to the allegations in this lawsuit. Now, the Eight Corners Rule only applies to the duty to defend, of course. The duty to indemnify is determined not by the allegations but by the facts proven. However, in the Gilbert construction case, Texas Supreme Court noted that after the other claims were dismissed and only the breach of contract claim remained, which fell within the exclusion but not within an exception to the policy, because that was the claim being settled, the only claim being settled, and it fell within the exception, there could be no coverage. Same is true here where all of the claims being settled in that second settlement agreement were for allegations that fell outside the scope of coverage under the intellectual property exclusion. Because there was no duty to defend, there can be no duty to indemnify. Brings us to the second point, Your Honors, and that is the intellectual property exclusion only applies to coverage for the entity, Paloma, itself. There's no dispute that Mauricio Toro, the employee, is providing coverage under the policy. However, the question is whether Paloma can make an end run around that exclusion by saying that all of the money it spent defending itself from allegations of its own misconduct can be reimbursed because they provided some ethereal benefit to the employee. Here the policy language is explicitly clear that the employee must be legally obligated to pay those amounts. As Paloma just told you, Mauricio Toro had separate counsel, and Axis has paid the portions of that counsel's invoices that arose after it was provided notice of the claim and after its duty to defend arose. The question is whether Paloma is also entitled to be reimbursed for the amounts it spent defending itself for its own counsel. There's no allegation that Toro was legally obligated to pay those amounts, and in fact, Paloma has never argued that he was legally obligated to pay. Instead, spending much of the briefing arguing that because it provided a benefit to him that it falls within coverage of the policy. However, policy language of legally obligated to pay is clear. This is further supported by this Court's analysis in the Lafarge case in which there was an exclusion relating to the conduct of the named insurance business, and one of the arguments made in that case was that because the contracted issue benefited the named insurance business that it fell within the scope of coverage. As this Court noted, such an interpretation would render the phrase relating to the conduct of its business essentially meaningless. Benefit does not mean relating to the conduct of its business just like benefit does not mean legally obligated to pay. Although it's not binding on this Court, the Northern District of Illinois has grappled with this same question in the Richardson Electric's case that's cited in our brief and came to a very thoughtful and erudite analysis of this issue that companies, entities are made up of their employees, but there's a difference between a commercial general liability policy and a director's and officer's coverage policy, the latter being what we have here, and then to accept this argument that any benefit to the employee falls within the scope of coverage and for which the company can be reimbursed would have the effect of transforming the director's and officer's coverage policy into a commercial general liability policy, drastically increasing the scope of coverage beyond what the party's contracted for, beyond what the insurance company agreed to provide coverage for, and cautioning that such a logic might signal the end of the court reform in America. Again, although it's not binding on this Court, we would posit that the analysis of the Richards Electric's case is directly applicable and should be adopted by this Court. Your Honors, this is a case of, as the District Court noted, industrial espionage. In the first settlement agreement and in the second settlement agreement, the documents at issue were defined as Continental's confidential trade secrets. And although the argument was not made today, it was made in the District Court below that these documents were all, or I apologize, that some of these documents were publicly available, and that's a key point that Paloma has argued in the District Court and only provided evidence that some were publicly available, not all. However, looking at the language of the second settlement agreement, it expressly states that the definition of confidential information does not include publicly available documents. The District Court did not have the benefit of reviewing these documents, neither did AXIS or its counsel. However, based on the representations Paloma made and the agreements between Paloma and Continental in the first and second settlement agreements, the District Court correctly concluded that the documents at issue were Continental's confidential information and trade secrets. So while we would argue that the policy at issue, the intellectual property exclusion, bars coverage because of the allegations and because of what was settled, should the Court adopt Paloma's interpretation of the intellectual property exclusion, the Court should still support the finding that the documents were confidential, were trade secrets, and that Paloma was engaged in misappropriating Continental's trade secrets. Your Honor, we ask this Court to affirm the District Court's grant of summary judgment and subsequent entry of judgment. The Court has no questions. I will return in the remainder of my time. Thank you. I would like to borrow the remainder of his time he didn't use if I could. Your Honor, briefly, I want to address the points that my opposing counsel made. On the first one, I think the simplest one, if you look at tab three, which is the policy itself, what I started out by saying gave Paloma the right to engage in negotiations without AXIS, and he says, no, that's only applicable to wage and hour. That's just a matter of contract interpretation. Page 11 under 6, under the D&O Defense and Settlement, I'm sorry, I'm sorry, it's under Conditions, I'm sorry, D&O 6C, if all insureds are able to fully and finally dispose of, with prejudice, all claims that are subject to one retention for an amount including defense costs not exceeding the applicable retention, the insurer's consent is not required. That's all claims, and you can't figure that out without having negotiations. You have the right to start negotiations to see where you end up. So to say it applies to wage and hour, we don't read it that way. It doesn't make any sense because you have the ability to negotiate to see where you end up. So starting the negotiations was not inappropriate. Arising out of, a big question, arising out of what? One cannot look at the phrase arising out of without asking arising from what, and that takes you back to 1, 2, and 3. Actual or alleged copyright infringement, misappropriation of trade secrets, or the unauthorized access of confidential information. Arising out of one of those three. Now to take the interpretation that Axis takes, then you render actual or alleged superfluous because you say it in one, but it's implied by arising out of, so we don't really need to say it. It's implicit within two and three. Well, that violates the rules. Number one of rendering phrases superfluous. I am struck by the comment that was made about that insurance companies, a contractor, just contracts, it ought to be read that way, and there are cases that say that as a general principle, but I'm going to read the quote that I like from the Bitco case. This court decided in 2022, Justice Higginbotham wrote this, when generally when the language of an insurance policy is susceptible to more than one construction, it should be construed strictly against the insurer and liberally in favor of the insured. When policy exclusions are at issue. So the first part was about the policy. Now we're talking about exclusions. He picks up when policy exclusions are at issue and even more stringent construction is required and we must adopt the construction of an exclusory clause urged by the insured as long as that construction is not itself unreasonable, even if the construction urged by the insurer appears to be the more reasonable one. So, I mean, yes, insurance contracts are contracts, but where interpretation issues are concerned, particularly exclusions, you can't get around this. And I think the case, the Nassar case that the U.S. Texas Supreme Court decided in 2018 is fascinating to me because in that case, in that case, the homeowner had a $250,000 coverage on his home and a $25,000 coverage on other dwellings. Now the definition of other dwellings was fences, included fences. The definition of your dwelling itself, the house itself, said anything affixed to the house. So they had $250,000 coverage on the house, $25,000 on the barn, was another structure, but the fence in between was damaged to the tune of $75,000. So if the fence was part of the house, good luck. You got plenty of coverage. If it's part of the dwelling, then you're out of luck because that's the lower $25,000. And so what the trial court and the court of appeals had said is because the word fence is used in the definition of other structures, obviously fences are part of the other structure. Texas Supreme Court says, no, you don't get to the definition of other structures to decide what the definition of dwelling is because dwelling says anything affixed to the house. Nassar, 2018. It's a very important case from interpretation standpoint of insurance contracts. What does this, we don't have to look at illegal profits. We don't have to look at any other provisions of this policy. In fact, we shouldn't is the teaching of Nassar. We should look to the definition of illegal profits. You keep talking about two reasonable interpretations. Isn't that the definition of ambiguity? It is a definition of ambiguity. And I've struggled with that because there are cases. You didn't say, I didn't see in your brief that you said this was an ambiguous exclusion. I don't think it's ambiguous and I think it's clear. It doesn't, frankly, it doesn't matter what I think because the court will decide whether it's ambiguous or not, even if both sides offer different interpretations. It is not ambiguous. It's clear as a bell. You know, because I think their interpretation is unreasonable. So, but, but, but, but if the question is, do I have to say the word ambiguity in order for me to make this argument? I don't think that's the rule. I think this court will decide what's ambiguous no matter what I say. But you didn't argue in the alternative that it's ambiguous. You just said this is, you're now arguing if there are two reasonable interpretations, you win because you're just reasonable, but you didn't. Which is an argument we made in the brief. Right. But I don't believe that, that, well, and, and I'm just, I don't think I used the word ambiguity. Do you see any daylight between, you're saying you do. I apologize, Your Honor. I've just seen you argue if you see any daylight between those two positions saying if there are two reasonable, you win because you get in these circumstances, you have to, if it's one is reasonable, you have, even if both are reasonable, you win. To me, that's ambiguous. You haven't said ambiguity, but, but you see daylight between those two concepts. Is that correct? I think that's right. I understand the way you're phrasing it, Your Honor. I think that it is not incumbent on me to plead an alternative ambiguity to, to invoke the, the doctrine that says my interpretation is reasonable and much more reasonable than theirs. And in fact, theirs is absurd. I think to say, but in the, in the alternative, if they're both reasonable, then it's ambiguous. I think it is, it's certainly implied, but I don't think it's mandatory for me to be able to make the arguments I'm making. If that would be my understanding of the law. I was just curious. Your Honor, thank you all so much for your time. The court will take a brief recess.